**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

―――――――――――――――――――――― :
                                                    :
EAW Group, Inc.,                    :
                                                    :
        Plaintiff,                          :
                                                    :
        v.                                       :          Civil Action No. 02-2425
                                                    :
The Republic of the Gambia, :
                                                    :
        Defendant,                      :
                                                    :
        v.                                       :
                                                    :
John E. Aycoth,                       :
                                                    :
        Counter Defendant      :
―――――――――――――――――――――― :


**<u>Memorandum Opinion</u>**

        Plaintiff, EAW Group, Inc. ("EAW"), filed this breach of contract action against Defendant, the Republic of the Gambia ("the Gambia"), an independent sovereign state. EAW's claims arise from the Gambia's alleged failure to compensate EAW for services rendered under their contract and from the Gambia's allegedly improper attempt to terminate that contract.

        The Gambia brought a counterclaim against EAW and its President, John E. Aycoth ("Aycoth"). The Gambia alleges that EAW and Aycoth fraudulently misrepresented facts about EAW's corporate status, fraudulently induced the Gambia to enter the contract, and breached the contract by failing to provide the agreed upon services.

        The Court held a four-day bench trial which commenced on

September 25, 2006 and concluded on September 28, 2006. Upon consideration of the entire record, for the reasons discussed below, the Court grants judgment in favor of EAW on its unjust enrichment claim in the amount of $41,666.67, plus interest accruing from September 30, 2002. The Court grants judgment in favor of the Gambia on all other claims by EAW, and grants judgment in favor of EAW and Aycoth on all claims asserted by the Gambia.

I.   **Findings of Fact**

    **A.   The First Agreement**

The Gambia is the smallest country on the African continental mainland and is very poor. During the administration of President William Jefferson Clinton, our State Department criticized it for its poor human rights record. After Gambian President Yahya A.J.J. Jammeh came to power through a coup in 1994, the Clinton administration imposed economic and political sanctions on the Gambia. In an effort to improve its image, visibility, and economic prospects, the Gambia sought help from lobbyists and consultants.

On May 15, 2000, the Gambia entered into a contract with EAW, a lobbying and consulting firm wholly owned by Aycoth. President Jammeh initiated contact with Aycoth because he was dissatisfied with lobbying services which were then being provided by Edward von Kloberg III. President Jammeh learned of Aycoth through London banker Paul Morgan, who knew that Aycoth had successfully

represented Taiwan, Nigeria, and the Congo, among other African countries.

President Jammeh asked Aycoth to replace von Kloberg. Aycoth negotiated the terms of the contract directly with President Jammeh by phone and sent him a draft copy of a proposed agreement via fax. President Jammeh reviewed the draft and copied the agreement onto official state letterhead. Aycoth traveled to the Gambia in late May of 2000 to sign the final agreement, meet Gambian officials, and begin work.

Under the terms of the contract, EAW agreed to provide a coordinated public relations program, a government affairs program, and a trade and economic development program. The contract was for one year, and the Gambia was to pay EAW $500,000 as compensation. The $500,000 included EAW's normal expenses, which Aycoth estimated to be 20 percent or $100,000. He also testified that expenses were usually included in the total contract price. The agreement contained a choice-of-law provision stating that District of Columbia law governed its interpretation and the parties' performance. The contract was scheduled to expire in May of 2001 and did not contain any provisions addressing early termination. EAW performed under the agreement, and the Gambia paid in full.[1]

---

[1] The first agreement did not define the terms "coordinated public affairs program," "government affairs program," and "economic development program." Aycoth provided consulting services, arranged meetings between American and Gambian government officials, arranged meetings between business executives and

Aycoth never received any notice that his performance had been deficient or unsatisfactory.  Although Aycoth did receive a letter (via fax) dated June 13, 2001 informing him that his contract would not be renewed, the letter thanked him for rendering "valuable service."  Moreover, as discussed below, the Gambia ultimately entered into a second agreement with Aycoth on almost identical terms as the first one.  The first agreement is not the subject of the instant dispute.

**B.   The Second Agreement**

On September 1, 2001, the Gambia entered into a second agreement with EAW.  Once again, Aycoth negotiated the terms directly with President Jammeh, with whom he had developed a close working relationship.  EAW again agreed to provide a coordinated public relations program, a government affairs program, and a trade and economic development program.  The second agreement was to be in force for two years, and the Gambia was to pay EAW $1 million as compensation ($500,000 for each year).  The $1 million fee again included EAW's normal expenses which Aycoth estimated to total

---

Gambian officials, and arranged interviews with reporters from major American news organizations.  Aycoth also coordinated Gambian officials' visits to the United States, coordinated visits to the Gambia for corporations seeking to do business there, negotiated a lease for the Gambian embassy in Washington, D.C., negotiated a residential lease for the Gambian Ambassador to the United States, provided copies of news stories and government filings related to the Gambia, accompanied the Gambian Ambassador on visits to Congress, and arranged a meeting with the executive director of Human Rights Watch.

$200,000 of the $1 million fee

The second agreement required the Gambia to make two payments of $500,000.  The first payment was due on execution, and the second was due on February 15, 2002.  The second agreement contained the same choice-of-law provision as the first stating that District of Columbia law governed interpretation and performance under the contract.  The contract was scheduled to expire in September of 2003 and did not contain any provisions addressing early termination.

The contract contained no benchmarks by which to measure EAW's performance.  The second agreement, like the first, did not define the terms "coordinated public affairs program," "government affairs program," and "economic development program."

The Gambia paid EAW $500,000 on execution of the contract, as agreed, but failed to make the second payment on February 15, 2002 or anytime thereafter.  Aycoth continued to perform under the agreement until September 30, 2002 despite the Gambia's failure to timely make the second payment. By letter dated September 23, 2002, Ms. Julia D. Joiner, Secretary General of the Gambia, terminated the second agreement on behalf of the Gambia as of September 30, 2002. Aycoth informed the Gambia that the second agreement did not contain an early termination clause.

### 1. Public Affairs and Government Relations Activities Conducted on Behalf of the Gambia under the Second Agreement

Aycoth provided various public affairs and government relations services to the Gambia during the time period covered by the second agreement. In February of 2002, he organized a celebration of Gambian independence for Gambian officials and embassy personnel at the Willard Inter-Continental in Washington, D.C. The invitation list included members of Congress, Congressional staffers, representatives from non-governmental organizations ("NGOs"), corporate executives, and others.

In April of 2002, at Aycoth's request, Congressman Edward Royce and Congressman Donald Payne—very influential members of the Congressional Subcommittee on Africa, Global Human Rights, and International Operations—signed a letter to President George W. Bush lauding President Jammeh's achievements and suggesting a meeting between the two Presidents. Aycoth worked with the Representatives' staffers to obtain the letter and reviewed early drafts. The meeting did not come about because of President Bush's busy schedule.

In May of 2002, Aycoth arranged for senior Gambian officials[2] to meet with representatives from UNICEF and the Bill & Melinda

_____

[2] The group of officials included Yahya A.J.J. Jammeh, President of the Gambia; Dodou Bammy Jagne, the Gambia's Ambassador to the United Nations; Famara Jatta, the Gambia's Secretary of State for Finance and Economic Affairs; and Yankuba Kassama, the Gambia's Secretary of State for Health & Social Welfare.

Gates Foundation, in New York City, during a Special Session of the United Nations General Assembly on Children.  Aycoth also arranged for President Jammeh to visit Ground Zero in New York City and to meet with Congressman Gregory Meeks and Congressman Donald Payne during his visit.  At the last minute, President Jammeh canceled all such meetings as well as telephone interviews that Aycoth had scheduled with several journalists.[3]

Aycoth also arranged meetings between Ambassador John P. Bojang and representatives from the National Geographic Channel, hoping they would lead to favorable stories about the Gambia and thereby encourage tourism.  Additionally, Aycoth used the internet to collect news stories and government filings regarding the Gambia, and faxed them on a timely basis to the Gambia's embassy and State House.

### 2.   Business Development Activities Conducted on Behalf of the Gambia

Aycoth made extensive efforts to develop business opportunities in the Gambia.  He helped potential investors obtain visas so they could travel to the country.  He organized and

---

[3] Aycoth also purchased items requested by Gambian officials including expensive watches, ambulances, and a bullet-proof BMW. He also purchased hundreds of thousands of dollars worth of items on behalf of President Jammeh.  Defendant's witnesses testified that the vehicles and other items were acquired for official government purposes.  Aycoth stated that he took on those duties as a favor to the President, but they did not fall within the scope of the agreement and were not part of his contractual responsibilities.  He also stated that he had never performed such duties for other clients.

facilitated meetings for various Gambian officials with representatives from several major corporations interested in investing in the country including GlaxoSmithKline, Bombardier International, Guilford Mills, and Amerada Hess. The meetings were all focused on creating new businesses and facilities in the Gambia so as to provide greater employment opportunities for the Gambian people.

Aycoth also worked on a fuel depot development project called GamFuels. The one existing fuel depot in the Gambia posed a threat to public safety and to the environment. Bruce Jewels, who Aycoth knew from prior business ventures, had lined up engineers, bankers, and environmental experts to begin construction on a replacement facility. The project was stalled however because the principals could not agree on financial responsibility for a $450,000 feasibility study. Jewels contacted Aycoth to see if EAW could assist in "taking the project further forward."

Aycoth worked with the Gambia's Finance Minister, Trade Minister, and President to break the impasse.[4] After successfully

_____

[4] Although Aycoth's work on the GamFuels project began some time before August of 2000 during the period covered by EAW's first agreement with the Gambia, documentary evidence admitted at trial clearly demonstrates that Aycoth continued his efforts to advance the project during the period covered by the second agreement. Plaintiff proffered several email and fax exchanges as evidence demonstrating his role, between August of 2000 and May of 2002, in facilitating payment for the feasibility study. On May 14, 2002, Jewels wrote to Aycoth confirming receipt of funds and thanking him for his "tenacity" in preserving the project's momentum.

arranging payment for the feasibility study, Aycoth continued to work with the Gambia and Jewels on finalizing the GamFuels project until he was advised that the Gambia would not honor the second year of their agreement.

### 3.   Gambian Dissatisfaction with the Contract

The Gambia does not generally dispute that Aycoth undertook the efforts described above.  The Gambia essentially maintains that Aycoth did not perform because his efforts failed to produce satisfactory results.

More specifically, the Gambia contends that Aycoth's government relations efforts were inadequate because he failed to arrange meetings with "high officials" (e.g., "cabinet members" and "under-secretaries").  The Gambia also points out that Aycoth's government relations efforts did not result in an increase in foreign aid.  Famara Jatta, the Gambia's Secretary of State for Finance and Economic Affairs, characterized the meetings arranged by Aycoth and EAW as mere "courtesy calls."

According to the Gambia, Aycoth's public relations efforts were inadequate because they did not increase tourism.  The Gambia also argues that it did not contract for scheduling and publicity services.

With respect to EAW's business development activities, the Gambia claims that the deals Aycoth presented did not come to fruition.  The Gambia acknowledges that it stymied deals presented

by EAW, but argues that the deals were unacceptable because the terms were excessively disadvantageous to its citizens.  But, as Aycoth testified, and the Court credits his testimony, only Gambian economic officials could complete all the procedures necessary to close the various development deals; he, as a private individual, could not.  Moreover, Aycoth provided credible evidence that two projects failed because the companies he introduced refused to pay bribes to Gambian officials.

While it is true that the second agreement does not define the terms "coordinated public affairs program," "government affairs program," and "economic development program," Aycoth provided the same types of services that the Gambia had accepted, without protest or complaint, under the first agreement.[5]  Because the terms of the two agreements differ only with respect to duration and compensation, there is no reason to believe that the parties could have reasonably intended substantial variation in Aycoth's performance under the second agreement.[6]  For these reasons, the

---

[5] Given the fact that EAW's contract was renewed shortly thereafter, the June 13, 2001 letter indicating the first contract would not be renewed cannot be given much weight.  Moreover, the Court cannot credit the Gambia's post hoc claim of dissatisfaction with services provided under the first agreement because it is exceedingly unlikely that President Jammeh would have then proposed a two-year agreement with identical terms.

[6] The Court suspects that Aycoth fell out of favor with President Jammeh because individuals in the Gambia, who were family members and friends of the President, were jealous of both his close personal relationship with the President as well as the substantial sums of money he was earning.  Because Aycoth was not

Court finds that Aycoth did not fail to perform his contract.

###     4.    EAW Did Not Engage in Fraud or Fraudulently Induce the Gambia to Enter into the Second Agreement

The Gambia claims that EAW falsely represented that it was a large corporation with offices around the world.  The Gambia also claims that Aycoth falsely represented that he had major contacts in Washington D.C. and could arrange meetings with high-level officials in the Bush administration.  The Gambia asserts that it reasonably relied on these representations in entering the second agreement.

The Gambia provided no evidence that Aycoth claimed an ability to arrange contacts with high-level officials.  Additionally, during the period covered by the first agreement, Aycoth did in fact arrange contacts with current and former members of Congress, Congressional staffers, Dr. Henry Kissinger, then-National Security Advisor Condoleezza Rice, representatives from NGOs, and others. The Gambia presented no evidence to suggest that it could have reasonably expected more significant contacts during the term covered by the second agreement than those arranged under the first agreement.

With respect to EAW's corporate status and capabilities, the

---

in the Gambia all of the time, those closest to the President had his ear and convinced the President to replace him with the previous consultant, von Kloberg III.  Undoubtedly, the fact that Aycoth, and those business people he brought to the Gambia, refused to accede to bribery demands did not endear him to those surrounding the President.

Gambia's accusations of fraud also lack support. Aycoth's letterhead only claims "affiliations" in the listed cities, and Jewels substantiated the existence of EAW's affiliate network. The Gambia failed to present any evidence that Aycoth made claims about the size of his organization, the nature of his "affiliations," or the number of people he employed.

## II.  Conclusions of Law

### A.  District of Columbia Law Controls

When adjudicating diversity suits, federal courts are usually bound to apply substantive state law. See 28 U.S.C. § 1652 (2006); Erie R.R. v. Tompkins, 304 U.S. 64 (1938). However, because the Rules of Decision Act, 28 U.S.C. § 1652, does not apply to the District of Columbia, Erie does not directly apply to this court. Gray v. Am. Express Co., 743 F.2d 10, 16-17 (D.C. Cir. 1984). Nevertheless, when adjudicating suits under diversity jurisdiction, federal courts in the District of Columbia have applied District of Columbia substantive law and choice-of-law rules to promote uniformity and to show deference to the local jurisdiction. Id.

The District of Columbia's choice-of-law rules permit parties to designate which law governs their contracts. Vaughan v. Nationwide Mut. Ins. Co., 702 A.2d 198, 200-201 (D.C. 1997). In the instant case, the parties' contract contains a provision noting that District of Columbia law controls its interpretation. Accordingly, the Court will apply District of Columbia law.

**B.   EAW's   Corporate   Charter   Was   Properly Revoked by Proclamation**

Aycoth first incorporated EAW in 1993 under the laws of the District of Columbia.[7]   District of Columbia corporations are required by statute to file a report with the Department of Consumer and Regulatory Affairs, Business Regulation Administration every other year, and to pay a report fee when filing.  D.C. Code §§ 29-101.121, 101.122 (2006).  EAW failed to file the required reports and failed to pay the required fees between the years 1996 and 2003.  Therefore, by proclamation, the District of Columbia revoked EAW's certificate and articles of incorporation on September 8, 1997.  D.C. Code § 29-399.24(a) (1997)(authorizing revocation by proclamation) (recodified in 2001 as D.C. Code § 29-101.123(a)).

The Gambia introduced in evidence a properly signed and sealed certification evidencing the revocation.  See D.C. Code § 14-501 (2006) (noting that signed and sealed certification by a proper record keeper is prima facie evidence of the fact that a public record is made).  EAW and Aycoth do not contest the fact that the District of Columbia revoked EAW's corporate charter by

---

[7] Prior to founding EAW, Aycoth had incorporated at least one other business entity under the laws of the District of Columbia. He founded Edward Aycoth Corp. under the laws of the District of Columbia in 1987.  He also founded Edward Aycoth Worldwide, Inc., a Delaware corporation qualified to do business in the District of Columbia.  Aycoth testified that he had "probably" incorporated a total of six businesses in various jurisdictions.

proclamation.   Instead,  they  argue  that  the  revocation  was ineffective  because  subsection  (b)  of  the  controlling  statute required  the  District  of  Columbia  to  publish  the  proclamation  in two general circulation newspapers (citing D.C. Code § 29-399.24(b) (recodified  in  2001  as  D.C.  Code  §  29-101.123(b))),  and  the  Gambia did  not  provide  evidence  that  any  such  publication  was  made. Additionally,  EAW  and  Aycoth  also  rely  on  subsection  (c)  of  the controlling  statute  stating  that  corporate  dissolution  becomes effective  "upon  publication  of  the  proclamation."   D.C.  Code  §  29-399.24(c)  (recodified  in  2001  as  D.C.  Code  §  29-101.123(c)). Finally,  Aycoth  and  EAW  argue  that  they  did  not  receive  actual notice of the revocation.

Subsection  (a)  of  D.C.  Code  §  29-399.24  states  "<u>upon  the issuance of such proclamation</u> the articles of incorporation or the certificate  of  authority  ...  shall  be  void  and  all  powers thereunder  inoperative  <u>without  further  proceedings  of  any  kind</u>." D.C.  Code  §  29-399.24(a)  (emphasis  added).   Consequently,  under  the plain  and  unambiguous  terms  of  the  statute,  publication  and  actual notice  have  no  bearing  on  the  effect  of  the  revocation proclamation.

Moreover,  corporate  dissolution  under  subsection  (c)  and revocation  of  a  corporation's  charter  under  subsection  (a)  are separate  and  distinct  legal  acts.   Dissolution  generally  involves distribution  of  corporate  assets  and  settlement  of  liabilities.

See D.C. Code § 29-399.24(c).  By comparison, revocation involves stripping a corporation of its powers.  See D.C. Code § 29-399.24(a).  Therefore, the Court concludes that EAW's certificate and articles of incorporation were properly revoked by proclamation on September 8, 1997, and further concludes that EAW's powers thereunder became inoperative upon revocation.

### C.   The Contract Between EAW and the Gambia Is Void

After revocation by proclamation, a corporation organized under District of Columbia law is "wholly without power to act or contract and its attempted acts and contracts are entirely void." Accurate Constr. Co v. Washington, 378 A.2d 681, 684-85 (D.C. 1977) (interpreting D.C. Code § 29-928(a)(1973))(internal citations and quotations omitted).  The controlling statute in Accurate Construction is nearly identical to D.C. Code § 29-399.24(a).[8] Based on its interpretation of D.C. Code § 29-928(a), the District of Columbia Court of Appeals barred a construction company from enforcing a promissory note executed after its corporate charter had been revoked by proclamation.  Accurate Constr. Co., 378 A.2d at 683-85.

---

[8] The 1973 version of the statute empowered a commissioner to issue the revocation proclamation, whereas the 1997 version of the statute at issue in the instant case empowers the Mayor to issue such proclamations.  Also, the 1973 version of the statute required corporations to submit reports and fees annually, whereas the statute at issue in the instant case requires corporations to submit reports and fees every two years.  In all other respects, the statutory language is identical.

EAW and the Gambia executed the second agreement on September 1, 2001.  However, EAW had not had any power to contract since the revocation of its articles of incorporation on September 8, 1997.[9] Id.  Therefore, the second agreement is void, and neither EAW nor Aycoth may recover the profits they expected to earn during the second year of the agreement.  Id.

EAW and Aycoth argue that Accurate Construction does not mandate such a result because, unlike the instant case, the corporate litigant in Accurate Construction had continued to conduct business with full knowledge that its charter had been revoked.  Id. at 685.  Although the District of Columbia Court of Appeals referred to the construction company's knowledge of the revocation proclamation in Accurate Construction, that reference was in the context of its discussion of equitable considerations which might–but did not in that case–warrant departure from the general rule that corporate contracts executed after issuance of a revocation proclamation are void.  Id.  The statute unambiguously makes revocation and its consequences effective upon proclamation, not upon knowledge or notification.  D.C. Code § 29-399.24(a). Plaintiff's attempt to distinguish Accurate Construction is not

---

[9] During the course of the instant litigation, Aycoth's attorneys at Baker Botts, LLP informed him that EAW's corporate filings were not current.  On June 29, 2004, Aycoth paid the required fees for 1996 through 2003.  He also filed a two-year report at that time.  Payment of required fees does not, however, retroactively validate voided corporate action.  Accurate Constr. Co v. Washington, 378 A.2d 681, 684-85 (D.C. 1977).

persuasive.

**D.   The Gambia Must Compensate EAW for Services Rendered Through September of 2002**

EAW claims that equity entitles it to the second payment of $500,000, notwithstanding the fact that the second agreement is invalid, because otherwise the Gambia would be unjustly enriched since it had the benefit of Aycoth's services.

"Unjust enrichment occurs when a person retains a benefit which, in justice and equity belongs to another." <u>Kramer Assoc., Inc. v. IKAM. Ltd.</u>, 888 A.2d 247, 254 (D.C. 2005). A party to a failed contract may recover compensation for a conferred benefit if justice so requires. <u>Id.</u> EAW claims that the Gambia received the benefits of Aycoth's performance during both the first and second years of the second agreement. More specifically, it contends that the Gambia unilaterally pursued development projects after September of 2002 that EAW and Aycoth had initiated under the second agreement.

The second agreement provided that the Gambia would pay $500,000 for each year in which EAW provided services. As recounted in the Court's factual findings, Aycoth provided significant services for thirteen months under the second agreement and received $500,000. He did not provide any services after September 30, 2002. As noted above, Aycoth cannot recover expected profits on the void contract, but he may recover for services provided through September of 2002.

17

The agreement itself provides the best evidence of the value of Aycoth's services.  Under the agreement, EAW earned $41,666.67 per month for services rendered.  EAW only received payment for twelve of the thirteen months in which Aycoth worked.  Accordingly, EAW is entitled to $41,666.67, plus interest accruing from September 30, 2002.

**E.   The Gambia Is Not Entitled to Recover the $500,000 it Paid to EAW**

The Gambia argues that it is entitled to recover the $500,000 paid to Aycoth for services during the first year of the second agreement because the entire agreement is void.  The Gambia claims that it should be allowed to benefit from thirteen months of Aycoth's labor, without providing any compensation, because he failed to submit required corporate reports and fees.

It is true that "a contract made in violation of a statute designed for police or regulatory purposes is void and does not confer rights upon a wrongdoer." Beard v. Goodyear Tire and Rubber Co., 587 A.2d 195, 204 (D.C. 1991) (internal citations and quotations omitted).  Courts have refused to provide even equitable relief where doing so would contravene a clear expression of legislative policy. E.g., Nixon v. Hansford, 584 A.2d 597, 598-99 (D.C. 1991).  Application of this rule has resulted in harsh forfeitures in cases involving unlicensed home improvement contractors. Id.

In Nixon, the District of Columbia Court of Appeals required

18

an unlicensed home improvement contractor, who had accepted money from a customer before completing the work, to return the entire payment, even though he had purchased materials and substantially performed, denying all recovery on even an equitable basis. However, Nixon, and other similar contracting license cases, relied on a regulation which prohibited unlicensed contractors from "accept[ing] any payment for a home improvement contract in advance of full completion of all work required." Id. (citing 16 DCMR § 800.1(1987)) (emphasis added).

Unlike the regulation at issue in Nixon, D.C. Code § 29-399.24(a) does not automatically foreclose equitable relief. See Accurate Constr. Co., 378 A.2d at 685 (noting that "equitable considerations" may affect an unregistered corporation's ability to recover compensation). Aycoth and EAW may not be able to recover expected profits on the void contract, but allowing the Gambia to retain the fruits of Aycoth's labor without compensation would clearly result in unjust enrichment. Kramer Assoc., Inc. v. IKAM. Ltd., 888 A.2d 247, 254 (D.C. 2005).

The Gambia argues that Kramer Associates requires repayment of the $500,000 paid to Aycoth under the second agreement. Id. The Gambia claims that EAW and Aycoth did not provide any services of value during the period covered by the second agreement, so the $500,000 paid to Aycoth for the first year of the second agreement constitutes unjust enrichment. See id. The Court disagrees.

19

Again, as already noted, Aycoth provided substantial valuable services to the Gambia for thirteen months.  Allowing him to retain compensation for work he actually performed obviously does not result in any injustice or inequity.  To the contrary, given the extent of Aycoth's efforts, requiring him to return the $500,000 would be unjust and inequitable.  In <u>Kramer Associates</u>, the court found the record "virtually devoid" of any evidence that defendant Kramer had performed the services for which he sought payment on an unjust enrichment theory.

The Gambia also advanced the alternative argument that, under a quantum meruit theory, it is entitled to recover the $500,000 paid to Aycoth because he failed to perform $500,000 worth of services.

The Gambia's quantum meruit argument is simply a variation of its unjust enrichment claim.  <u>Cf.</u> <u>United States ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co.</u>, 81 F.3d 240, 247 (D.C. Cir. 1996) (noting that evidence supporting a quantum meruit claim is often identical to evidence supporting an unjust enrichment claim because of the similarities between the two causes of action).  The Gambia's petition for quantum meruit relief will be denied because Aycoth provided the very services that the parties had agreed upon, and the amounts contained in the agreements themselves provide, in this case, the most compelling evidence of what the Gambia thought those services were worth.

**F.    Neither EAW Nor Aycoth Engaged in Fraud Or Fraudulent Inducement**

The Gambia argues that Aycoth engaged in fraud and fraudulent inducement.  The Gambia claims that he fraudulently represented that EAW was a large corporation with offices around the world, that EAW had major contacts in Washington D.C., and that EAW could arrange meetings with high level officials in the current administration.

To establish a claim of fraud or fraudulent inducement, the Gambia must to prove that (1) Aycoth made a false representation, (2) in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, (5) the Gambia took action in reliance upon the representation, and (6) its reliance was reasonable.  See Hercules & Co. v. Shama Restaurant Corp., 613 A.2d 916, 923 (D.C. 1992).  The Gambia has not satisfied the elements necessary to prevail on its fraud or fraudulent inducement claims.

Although Aycoth may have been extremely negligent, as a sophisticated businessman, in failing to timely submit required reports and fees, the Gambia did not introduce evidence sufficient to demonstrate that he knew that the District of Columbia had revoked EAW's corporate status.  The Gambia therefore cannot prove that Aycoth had knowledge that EAW was not a corporation nor that he intended any deception about EAW's corporate status.  Id.  The Gambia also did not introduce evidence that Aycoth made any statements about EAW's size or the number of EAW's employees.  Id.

21

As noted in the Findings of Fact above, the Gambia did not provide any evidence that Aycoth claimed an ability to arrange contacts with officials in the current administration; however, even if Aycoth had made such claims, the Gambia could not have reasonably expected substantially different contacts under the second agreement than those he had arranged during the period covered by the first agreement.  Id.

### G.   The Court Need Not Reach the Issue of Aycoth's Personal Liability

The Gambia has not prevailed on any of its claims against EAW or Aycoth.  Accordingly, the Court need not entertain the Gambia's arguments about the latter's personal liability under a veil-piercing theory.

### III. Conclusion

For the reasons noted above, the Court grants judgment in favor of EAW on its unjust enrichment claim in the amount of $41,666.67, plus interest accruing from September 30, 2002.  The Court grants judgment in favor of the Gambia on all other claims by EAW, and grants judgment in favor of EAW and Aycoth on all counterclaims asserted by the Gambia.  An Order will issue with this Memorandum Opinion.

/s/
_____
November 20, 2006                    GLADYS KESSLER
                                     United States District Judge
**Copies to:** **Attorneys of record via ECF**